Donald G. WAINWRIGHT and Sylvia V. Wainwright, Plaintiffs,

v.

Earl E. ALLEN, Individually and d/b/a AAA Realty, a/k/a Allen Realty Co.: AAA Realty, a/k/a Allen Realty Co., Defendants.

Civ. No. A77–4011.

United States District Court, D. North Dakota, Northwestern Division.

Dec. 5, 1978.

Duane E. Houdek, Bismarck, N. D., for plaintiffs.

Moody M. Farhart, Judith E. Howard, Minot, N. D., for defendants.

## MEMORANDUM AND ORDER

VAN SICKLE, District Judge.

This is a civil action arising under the Civil Rights Act of 1866, 42 U.S.C. § 1982, and under Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3604, also known as the Fair Housing Act. Among the remedies sought by the Plaintiffs are injunctive relief, actual damages and punitive damages. Trial was had before the Court.

The controversy in this case centers around a residence located at 1071 West Central, Minot, North Dakota. The residence is owned and was formerly occupied by the Defendant, Earl E. Allen. Mr. Allen, a real estate agent experienced in the rental and sale of real property, had been renting the residence for $300 per month when he was informed by his tenant that the house would be vacated by December 1, 1976. In an effort to rent the house and in the course of his business as a real estate agent, Mr. Allen ran the following advertisement in the Minot Daily News from November 2 through November 8, 1976: "King sized townhouse duplex. Garage. Trees. Partial basement. December 1. $315. 838–0644." As the end of November approached, however, the residence remained unrented.

From November 27 through December 3, 1976, Mr. Allen ran the following advertisement in the Minot Daily News: "King size townhouse apt. with garage. Charming, secluded area. Trees. Fireplace. Basement area. Carpeted. Immediate possession. Couple, one child. No pets. 838–0644." Mr. Allen received several responses to this advertisement. On December 1, 1976, Thomas Drake was shown the house at 1071 West Central and was told that the rental was $315 per month and was invited to go to Mr. Allen's office and fill out the rental agreement. Mr. Drake felt the house was too large and expensive so he never returned to Mr. Allen's office. On December 2, 1976, George Spiros was shown the house, was told the rental was $315 per month, and was invited to stop in at Mr. Allen's office to fill out a rental agreement. Mr. Spiros also decided that he was not interested in the property.

On Thursday, December 2, 1976, at approximately 8:00 p.m., Donald and Sylvia Wainwright, the Plaintiffs, called Mr. Allen in response to the second advertisement and made an appointment for Mr. Allen to show them the house on Friday, December 3, at 11:00 a.m. Mr. and Mrs. Wainwright were a black, married, Air Force couple, with one child, who had been transferred from California to the Minot Air Force Base. They had made application for base housing prior to their arrival at Minot on November 24, 1976 but were put on a waiting list. In the telephone call to Mr. Allen, Mr. Allen told Mrs. Wainwright that he had advertised the house for $315 per month. Mrs. Wainwright testified that when she tried to negotiate on the price, Mr. Allen mentioned that a lesser figure could be discussed—possibly $300 per month. When asked when the Wainwrights could have possession of the house, Mr. Allen stated that the carpets had been cleaned and the doors refinished and the house was ready for occupancy.

Around 11:00 a.m., Friday, December 3, 1976, Mr. and Mrs. Wainwright arrived at Mr. Allen's office. Mr. Allen had the Wainwrights follow him to the house and showed them through the residence. The tour of the house took about 45 minutes. Mr. Allen explained that about three-fourths of the garage was taken up by his personal belongings and that they would remain there. Mr. Allen also told the Wainwrights that he would reserve access to the property and that he had no objection to the Wainwrights planting more flowers and rose bushes in the yard. While viewing the basement, Mr. Allen and the Wainwrights observed Dennis Ward, a handyman, paint-

ing the floor of one room. Before leaving the house, Mrs. Wainwright once again asked if the price was negotiable and Mr. Allen replied that it was not. Mr. Allen further told the Wainwrights that if they were interested in the house, they should stop by the office and fill out an application. Mr. Allen cautioned, however, that he had two other applicants interested in the house. The Wainwrights disclosed to Mr. Allen that they desired to take advantage of Base housing as soon as it would open up to them. The Wainwrights had applied for Base housing in October, 1976, and expected to be admitted six to nine months from that date.

The Wainwrights then went to lunch and drove by another house that they had an appointment to view. After a cursory exterior examination of this second house, the Wainwrights decided it was too small and proceeded to Mr. Allen's office to fill out an application for the house at 1071 West Central.

Sometime during the afternoon of Friday, December 3, 1976, the Wainwrights executed the application for rental and a rental agreement. The rental agreement stated that the Wainwrights agreed to rent the house at 1071 West Central for $315 per month for a period not less than twelve months commencing on December 5, 1976. They agreed to deposit one month's rent as security and made the deposit of $315. The agreement provided that the Wainwrights were responsible for all utilities. Mr. Allen was not present when the Wainwrights filled out the application and agreement. Mr. Allen's secretary, Denise Carpenter, helped the Wainwrights fill out the forms. As the Wainwrights left the office, Mr. Allen arrived. Upon learning that the Wainwrights had filled in the forms, Mr. Allen said he would look over the application and call the Wainwrights on Saturday.

Mr. Allen's real estate office was not generally open on Saturdays or Sundays, nor did Mr. Allen's handyman, Mr. Ward, work on weekends. Nevertheless, Mr. Allen went back to the house around 6:00 p.m. on Friday evening and requested that Mr. Ward work on Saturday so that the house would be ready for the Wainwrights to move in on Sunday or Monday at the latest.

There is some dispute as to the activities of the parties on Saturday and Sunday. Mr. Allen testified that he felt he had communicated to the Wainwrights that they could rent the premises and the only question remaining to be worked out was the question of possession. Mr. Allen testified that the call on Saturday was to tell the Wainwrights when the house would be ready, not whether they would be allowed to rent. He testified that he tried to call them between 2 and 3 o'clock on Saturday afternoon but received no answer and never did talk to the Wainwrights on Saturday. Mr. Allen further testified that he called the Wainwrights at 9:30 a.m. on Sunday to tell them to "come get the keys."

When the Wainwrights arrived at Mr. Allen's office at 2:30 p.m. on Sunday, they told him that they had rented another house and asked for their security deposit back. Mr. Allen refused to return the $315 deposit.

The Wainwrights testified that they had not received a phone call by 2:30 p.m. on Saturday so they drove down to Mr. Allen's office. They testified that while Mrs. Wainwright remained in the car, Mr. Wainwright went to Mr. Allen's office in the Town and Country Shopping Center. Mr. Wainwright testified that Mr. Allen told him no decision had been made and that he probably wouldn't reach a decision until Sunday or Monday.

That evening the Wainwrights went through the advertisements in the paper and called to make an appointment to see another house at 12:00 noon on Sunday, December 5, 1976. The Wainwrights testified that when Mr. Allen called on Sunday morning, he asked if the Wainwrights could bring further references that afternoon. The Wainwrights viewed the second house before going to see Mr. Allen and they rented this second house. The rent on this house was $300 per month with a $50 security deposit. It was a month-by-month lease with a thirty-day notice requirement. It

was after this lease was completed that the Wainwrights went to Mr. Allen's office and asked for their deposit back. Concerning the refund of the deposit, Mr. Allen suggested to Mr. Wainwright that he check with the Off Base Housing Referral Office.

Mr. Wainwright contacted Richard Ringdahl, the Housing Referral Officer at the Minot Air Force Base, and explained what had happened. Mr. Ringdahl felt that there possibly was some racial discrimination on Mr. Allen's part so he contacted Sergeant Robert Fuller to act as a verifier. Mr. Ringdahl also had a member of his staff, Karen Extine, call Mr. Allen's office to find out what the house rented for. Mrs. Extine talked to Denise Carpenter and was informed that the rent on the house was $300 per month with a $300 security deposit.

On Monday, December 6, at 4:45 p.m., Sergeant Fuller called Mr. Allen's office and set up an appointment to see the house at 12:50 p.m. the following day. Sergeant Fuller told Mr. Allen over the phone that he was married and had a six year old son and was in the Air Force. These statements were intended to, and did, coincide with the situation the Wainwrights presented. However, Mr. Fuller represented that he wanted to keep his family in town and was not interested in utilizing Base housing. This was a material difference from the situation the Wainwrights presented. On Tuesday, Denise Carpenter gave Sergeant Fuller the tour of the house. She told Sergeant Fuller that the rent was $300 per month and that if wanted to rent the house, he would have to stop by the office and fill out the application for rental and rental agreement. When Sergeant Fuller viewed the house, Mr. Ward was still doing touch-up work on it. Sergeant Fuller never reached specifics however. He never found out when he could take possession, he never discussed length of the lease, nor did he go down to Mr. Allen's office to fill out the application. Sergeant Fuller called at a later date to tell Denise Carpenter that he was no longer interested in the house.

After Sergeant Fuller reported to Mr. Ringdahl at the Housing Referral Office, the referral office issued a letter "sanctioning" Mr. Allen. Mr. Ringdahl testified that Mr. Allen's prejudice was demonstrated in a telephone conversation on December 13, 1976, in which Mr. Allen vehemently protested the "investigation" and burst out that "it was the spics, niggers, wops, Jew boys, and the ACLU that was causing this country to go down the drain."

The Wainwrights moved into the house at 211 18th Street Southeast and lived there for two and one-half months before moving into Base housing. The Wainwrights also litigated their $315 security deposit claim in small claims court and recovered.

From this factual setting, the Wainwrights allege a denial of their civil rights in violation of 42 U.S.C. § 1982 and 42 U.S.C. § 3604, which provide in relevant part as follows:

§ 1982. PROPERTY RIGHTS OF CITIZENS. All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property. 42 U.S.C. § 1982.

§ 3604. DISCRIMINATION IN SALE OR RENTAL OF HOUSING. As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

(a) * * *

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin.

(c) * * *

(d) * * *

(e) * * *

42 U.S.C. § 3604(b)

The Wainwrights contend that they were discriminated against in the terms, conditions, and privileges of the rental of the house, in that, their rent was $315 per month on a one-year lease and these terms weren't required of others. The Wain-

wrights further contend that Mr. Allen delayed the rental of the house, in that, he never gave them the keys within 48 hours of their making the application and paying a security deposit and he asked for more references. The Wainwrights also contend that Mr. Allen discouraged them from renting the house by telling them that he would keep his property in the garage, that the lawn was in a poor state, and that he would have to retain access to the house. The Wainwrights allege Mr. Allen did all this because they are Negroes.

Sections 1982 and 3604 are clear on their face and do not admit of technical legal arguments as to what action they prohibit. Thus, the ultimate issue in this case is a factual question: Did Earl Allen discriminate against the Wainwrights in the terms, conditions, or privileges of rental of the house because they are black? I find that he did not.

█ It is not necessary in a racial discrimination to make a showing that the action was racially motivated. In *Wharton v. Knefel*, 562 F.2d 550 (8th Cir. 1977), the Eighth Circuit reaffirmed that the Civil Rights Acts were designed to remove artificial barriers in housing and that proof of racial intent was not required under the acts. The Court stated as follows:

". . . To establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect. (citation omitted) . . . The plaintiff need make no showing whatsoever that the action resulting in racial discrimination in housing was racially motivated. . . . Effect, and not motivation, is the touchstone, in part because clever men may easily conceal their motivations, but more importantly, because . . . (w)hatever our law was once, . . . we now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme. *United States v.*

*City of Black Jack, Missouri*, 508 F.2d 1179, 1184–85 (8th Cir. 1974)."

*Id.* at 555.

Earlier the same court, in *Williams v. Mathews Co.*, 499 F.2d 819 (8th Cir. 1974), stated as follows:

"When a plaintiff makes a prima facie case of discrimination, as here, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the plaintiff's rejection." (citation omitted).

*Id.* at 827.

But in this case, the Wainwrights have not established a prima facie case by demonstrating a racially discriminatory effect.

█ It is uncontroverted that Mr. Allen placed the house on the open market for rent. The only price listed in the newspaper advertisements is one of $315 per month. Mr. Allen showed the house to two white families shortly before showing it to the Wainwrights and the price quoted was one of $315 per month. Mr. Allen informed each of these prospective tenants that they would have to go to his office and fill out an application for rental and rental agreement if they were interested in renting his house. These are the exact conditions placed upon the Wainwrights. They were told that the rent was $315 per month and that they would have to fill out the forms at his office if they wanted to rent the house.

The Wainwrights were the only ones who went to the office and filled out the application and rental agreement and put down a security deposit. This was all done on Friday afternoon, December 3, 1976. The evidence is not clear as to whether an agreement had been reached between the parties, and the Wainwrights had been accepted as tenants. However, the lapse of 48 hours between the Wainwrights' application of rental of Mr. Allen's house and Wainwrights' renting of the second house did not constitute a sufficient amount of time under the circumstances to be considered a discriminatory stall tactic on Mr. Allen's part. Forty-eight hours is a short period of

time when one considers that most of it elapsed during the weekend.

I am convinced that the Housing Referral Office's attempt to discover racial discrimination through the use of a verifier failed to show any discrimination between the terms and conditions given the Wainwrights and those given Sergeant Fuller. Sergeant Fuller was not given the tour of the house by Mr. Allen but rather by Mr. Allen's secretary. Sergeant Fuller was told that he would have to return to Mr. Allen's office to fill out the same application for rental and rental agreement as the Wainwrights. Sergeant Fuller, however, did not do this. Sergeant Fuller never discussed the length of the lease nor when he could take possession if he were accepted as a tenant. Most importantly, Sergeant Fuller was never accepted by Mr. Allen as a tenant. Thus, Sergeant Fuller failed to accomplish his objectives of finding out whether he could rent the house and under what terms and conditions he could rent it. I feel the slightly lower price quoted Sergeant Fuller and the Housing Referral Office merely means that Mr. Allen was coming down in his price in an effort to rent the house before winter struck and to a more permanent tenant. If the house remained unrented during the fury of a North Dakota winter, Mr. Allen would have to pay the high price of utilities and run the risk of having the house freeze up.

As to the Wainwrights' claim of discrimination due to Mr. Allen telling them of unattractive features of the house, I cannot agree. The fact that Mr. Allen took the time to explain to the Wainwrights that they would be required to keep up the lawn, that property stored in the garage would remain, and that Mr. Allen would have to retain access to the house, convinces me that Mr. Allen was conducting himself toward the Wainwrights as a realtor without regard to their race. These were problem areas that had to be ironed out before a lease could be concluded.

It is my conclusion that Earl Allen did not discriminate against the Wainwrights at all. The Wainrights, in early December

of 1976, found themselves in dire need of a house. Their time in the Air Base's temporary living quarters was limited, their furniture would arrive from California at any time, and their daughter needed a home so she could start attending school. They entered a rental agreement with Mr. Allen and within 48 hours entered another lease agreement with a Mrs. Hiecke. They may have entered this second lease because the rent and the security deposit were less and it did not require a one-year lease thereby enabling them to move into Base housing when it became available. On the other hand, they may have entered this second lease because they were demanding immediate occupancy and they felt they couldn't get Mr. Allen's house fast enough. Whatever the reason, it was their conscious decision to withdraw their application for rental and they cannot be heard now to claim race discrimination.

As to the bigoted and extreme statement made by Mr. Allen to Mr. Ringdahl on December 13, 1976, no civil liability can attach to it. The first amendment protects the freedom of speech even though that speech be bigoted. The statement may show Mr. Allen was prejudiced but it cannot establish actionable discrimination as a fact, where no discriminatory act has been shown.

Based upon the foregoing, I find that the Defendant, Earl Allen is entitled to judgment of dismissal.

Counsel for the Defendant in the answer and amended answer seeks attorneys' fees, and has asserted his right thereto in his post-trial brief. Attorneys' fees are available to the defendant in a civil rights action under 42 U.S.C. § 1988 which provides in relevant part as follows:

"In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or in any civil action or proceeding, by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the United States Internal Revenue Code, or title VI of the Civil Rights Act of 1964,

the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

42 U.S.C. § 1988

The statute itself contains no standard for awarding attorneys' fees to a defendant. It merely provides that the court, in its discretion, may allow the prevailing party a reasonable attorney's fee. The legislative history, however, indicates that while a prevailing plaintiff " 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust,' " a prevailing defendant is not routinely entitled to attorneys' fees. Senate Report No. 94–1011 (June 29, 1976), 1976 U.S.Code Cong. and Admin.News at pp. 5908, 5912. This report states as follows:

"Such 'private attorneys general' should not be deterred from bringing good faith actions to vindicate the fundamental rights here involved by the prospect of having to pay their opponent's counsel fees should they lose. *Richardson v. Hotel Corporation of America*, 332 F.Supp. 519 (E.D.La.1971), aff'd, 468 F.2d 951 (5th Cir. 1972). (A fee award to a defendant's employer, was held unjustified where a claim of racial discrimination, though meritless, was made in good faith.) Such a party, if unsuccessful, could be assessed his opponent's fee only where it is shown that his suit was clearly frivolous, vexatious, or brought for harassment purposes. *United States Steel Corp. v. United States*, 385 F.Supp. 346 (W.D.Pa.1974), aff'd, 9 E.P.D. ¶ 10,225 (3d Cir. 1975). This bill thus deters frivolous suits by authorizing an award of attorneys' fees against a party shown to have litigated in "bad faith" under the guise of attempting to enforce the Federal rights created by the statutes listed in S. 2278. Similar standards have been followed not only in the Civil Rights Act of 1964, but in other statutes providing for attorneys' fees."

*Id.*

█ The formulation, "clearly frivolous, vexatious or brought for harassment purposes," must be compared with the traditional American rule allowing a prevailing party attorneys' fees when his opponent has litigated "in bad faith, vexatiously, wantonly, or for oppressive reasons," due to the fact that the Defendant has filed, alternatively, under this American rule. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). While there is a substantial overlap in these standards, the common law rule depends almost solely on actual bad faith, either in the purpose or the conduct of the litigation. Likewise, most suits awarding attorneys' fees to defendants under the statutes have involved malicious litigation, e.g., *Carrion v. Yeshiva University*, 535 F.2d 722 (2nd Cir. 1976) (the plaintiff's testimony was characterized as an "unmitigated tissue of lies" by the trial judge), or vexatious conduct of a plaintiff in the course of the litigation, e.g., *Robinson v. KMOX–TV CBS Television Station*, 407 F.Supp. 1272 (E.D. Mo.1975). But the statutory language and the inclusion in itself of defendants under the statute suggest that prevailing defendants may recover under less striking circumstances than the traditional bad faith, harassment, or absolute refusal to cooperate in the litigation.

The mere fact that Congress intended 42 U.S.C. § 1988 to benefit defendants indicates that the standard to be applied in favor of defendants must be more liberal than bad faith. Otherwise, the statute would be redundant and unnecessary given the court's equity powers to award attorneys' fees under the traditional American rule. The legislative report used the language "clearly frivolous" in its formulation. It also stated that the standard under 42 U.S.C. § 1988 should be "generally the same as under the fee provisions of the 1964 Civil Rights Act." Senate Report No. 94–1011, 1976 U.S.Code Cong. and Admin.News at p. 5912. Various Title VII cases have characterized the standard to be applied to the plaintiff's case as "unreasonably brought," *Paddison v. Fidelity Bank*, 60 F.R.D. 695 (E.D.Pa.1973); "frivolous or factually baseless," *Lee v. Chesapeake and Ohio Ry. Co.*, 389 F.Supp. 84 (D.Md.1975); and "unrea-

sonable, frivolous, meritless or vexatious," *Carrion v. Yeshiva University*, 535 F.2d 722 (2nd Cir. 1976).

I believe I must apply the standard of "clearly frivolous, vexatious or brought for harassment purposes" with care, since Senate Report No. 94–1011 emphasized that "private attorneys general" should not be penalized for proceeding with a claim which though meritless was made in good faith. I find that under the circumstances of this case, the action was not "unreasonably brought", "frivolous or factually baseless," or "unreasonable, frivolous, meritless or vexatious." I find that the Wainwrights' cause of action, though meritless, was made in good faith and the Defendant is not entitled to attorney's fees under 42 U.S.C. § 1988 or under the traditional American rule.

Counsel for the Defendant will forthwith prepare and submit an appropriate form of judgment in conformity herewith. This memorandum and order is deemed to satisfy the requisites of Rule 52, Federal Rules of Civil Procedure.