Arthur L. SEYMORE, Plaintiff,

v.

READER'S DIGEST ASSOCIATION,
INC., Defendant.

No. 77 Civ. 4825 (WCC).

United States District Court,
S. D. New York.

Jan. 16, 1980.

Malcolm H. Bell, Norwalk, Conn., for plaintiff.

Edward B. Packard, New York City, for plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant; Martha J. C. Farquar, William Barnabas McHenry, Morris B. Abram, Stuart A. Licht, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

Defendant Reader's Digest Association, Inc. ("Reader's Digest") has moved for summary judgment against plaintiff Arthur L. Seymore ("Seymore") in this employment discrimination and breach of contract action. Defendant has further moved to dismiss plaintiff's claim under 42 U.S.C. § 1981 as untimely, and to strike plaintiff's demands for a jury trial and for compensatory and punitive damages. For reasons set forth below, defendant's motion for summary judgment is denied as to plaintiff's claims of discrimination in starting salary, working conditions, rejection of his suggestions and ideas, merit review, bonuses, failure to transfer and termination; granted as to plaintiff's claims of discrimination in training, subject to plaintiff's submission of a further offer of proof on this issue; denied as to plaintiff's claims in *quantum meruit*; and granted as to plaintiff's implied contract claim. Defendant's motions to dismiss plaintiff's § 1981 claim on statute of limitations grounds and to strike plaintiff's demand for a jury trial are denied.

*Background*

The parties do not dispute the following basic facts underlying plaintiff's action. On November 11, 1974 plaintiff, a Black 1974 graduate of the University of Maryland, began work at Reader's Digest as a trainee in the Advertising Production subdivision of the Production Department at a starting salary of $10,000. In Advertising Production, Seymore worked on a series of printing projects, some of which involved use of a densitometer, a machine which measures the intensity of color. Seymore learned how to operate a densitometer, and used the machine to measure the faithfulness of Reader's Digest printed pages to the color originals supplied by advertisers, and to measure the effects of several printing quality experiments with various inks, screens and papers.

Based on his work with the densitometer and with printers and ink suppliers, and while he was working in Advertising Production, Seymore made several suggestions for improving the Reader's Digest printing process: (1) that the densitometer be used to measure the color to be printed by the various types of Reader's Digest presses in advance of a press run, so that each press could be adjusted to reduce the number of instances of unfaithful reproduction of an advertiser's color original (and thereby avoid the necessity of giving advertisers subsequent free advertising space)[1]; (2) that the ink feed systems used in the presses which print Reader's Digest be changed

---

1. Defendant's affidavits further discuss a suggestion by Seymore to use the densitometer to measure quality of advertisers' submitted originals (Dutton affidavit).

from manual or semi-automatic ink feed to automatic ink feed; (3) that fewer dots of color per inch be used in printing Reader's Digest color pictures (*i. e.*, a change from use of a 120-line screen (120 dots per inch) to a 100-line screen); and (4) that the inks be reformulated. The first two suggestions were rejected by Seymore's superiors as impractical; the second two changes were subsequently made by Reader's Digest.[2]

In February 1976, Seymore was transferred to the Book Production subdivision of the Production Department. During the period immediately following this transfer, Seymore continued to work on certain of the print experiments in which he had been engaged while still in the Advertising Production subdivision. In his new position, Seymore made a further suggestion, that Reader's Digest use the same-sized film for the illustrations on the dust jackets of Reader's Digest Condensed Books as is used for the pictures on the "box wrap" in which Condensed Books are packed.[3]

In May 1976, Seymore sent a memorandum to the President of Reader's Digest, Kent Rhodes, requesting transfer to another department of the corporation due to the "irrational behavior" of Seymore's former supervisor in Advertising Production, Bert N. Caldwell. In the memo, Seymore further urged adoption of his suggestion on installation of an automatic ink feed system to improve the Reader's Digest printing process. Rhodes had lunch with Seymore to discuss the issues raised in the memorandum. At certain points during the weeks immediately following that luncheon meeting, Seymore met with J. Edward Hall, Personnel Director of Reader's Digest, to discuss Seymore's transfer to another department. These discussions were not fruitful. During that time, Seymore composed a further memorandum concerning the Production Department's failure to adopt an automatic ink-feed system. On June 16, Seymore's employment with Reader's Digest was terminated.

Following his termination, Seymore brought a complaint before the New York State Division of Human Rights charging employment discrimination. The Division determined that there was no probable cause to believe Reader's Digest had discriminated against Seymore, and that determination was upheld by the State Human Rights Appeal Board.

*Contentions of the Parties*

In this lawsuit, plaintiff asserts that he was treated in a discriminatory manner by Reader's Digest with respect to compensation, terms of employment, and discharge, in violation of § 703 of Title VII, 42 U.S.C. § 2000e–2, and of 42 U.S.C. § 1981. In particular, plaintiff contends that (1) he was hired at a discriminatorily low salary; (2) that while he worked in Advertising Production, he was denied the work space, access to office supplies, personalized notecards and stationery and written job description which white employees in that subdivision received; (3) that he received discriminatorily minimal training; (4) that his suggested improvements were treated summarily or rejected for racially-motivated reasons; (5) that he was denied bonuses for his suggestions and general performance, while white employees received such bonuses; (6) that he failed to receive a merit review and raise following his transfer to Book Production, while white employees received such a review after a transfer; (7) that after his transfer he was required to work double time, in a manner not required of whites; and (8) that he was given inaccurate information as to openings in other departments to which he might be transferred and was terminated, contrary to the reasons given to him at the time, when such transfer opportunities could have been made available to him. Plaintiff supports his allegation of discriminatory treatment by citing instances of alleged ra-

2. Although defendant contends these suggestions were neither innovative nor original with Seymore, see discussion *infra*.

3. Defendant contends that this suggestion, while practical, was also not original with Seymore, but in fact had been done once in the 1950's and in the two years immediately prior to 1976.

cial slurs directed at him by Reader's Digest personnel, in particular, the use of the term "black magic" by Production Department Director Richard Dutton and the use of the term "splitting a niggerhead" by the Manager of the Advertising Production subdivision, Bert N. Caldwell. Plaintiff further points to the low overall percentage of Blacks in the Reader's Digest work force, in comparison to the overall and work-age populations of New York City, and to the fact that Seymore was the only Black employee reported in 1976 in the highest Equal Employment Opportunity Commission employment category, Officers and Managers, at Reader's Digest.

Plaintiff further contends that he is entitled to damages, first under a *quantum meruit* theory, in that he relied on Reader's Digest's implied promise to pay him bonuses or suggestion awards; second, on the theory that since Reader's Digest wrongfully terminated plaintiff's employment contract, plaintiff may elect to recover on a *quantum meruit* basis the difference between the value of services rendered and the salary already received; and third, on an implied or quasi-contract theory that, even if plaintiff and Reader's Digest did not impliedly agree on payment of bonuses for plaintiff's suggestions, Reader's Digest was unjustly enriched by receipt of plaintiff's suggestions and ideas.

Defendant moves to dismiss plaintiff's Title VII, § 1981 and *quantum meruit* claims on the ground that plaintiff has failed to set forth, either in affidavits or in supplemental discovery material, specific facts showing that there is a genuine issue for trial, as required by Rule 56(e); that as to certain of his employment discrimination allegations, plaintiff has failed to specify in supporting affidavits or discovery material any factual basis sufficient to state a *prima facie* case, while as to other allegations, plaintiff has failed to come forward with factual support for a claim that the nondiscriminatory business reasons specified by defendant for defendant's actions were in fact pretexts for racial discrimination. Defendant supports this position as to plaintiff's employment discrimination claims

with affidavits stating that (1) Seymore received the highest starting salary of any of the white employees whose positions plaintiff has specified as being comparable to his own except for one man with twenty-two years' printing experience, who received a starting salary of $15,000; (2) that Seymore was treated just as any trainee would have been treated with respect to working conditions and (3) training opportunities; (4) that Seymore's ideas were dismissed for various sound business reasons; (5) and (6) that Seymore received the same annual raises as all other Reader's Digest employees, was considered for merit raises and bonuses under the same standards as all employees, and that in fact, in 1976, Seymore received the highest percentage merit raise of any Reader's Digest employee in the Advertising or Book Production subdivisions of the Production Department; (7) that while Seymore was asked to work on certain Advertising Production matters after his transfer to Book Production, this was done for reasons of business efficiency to finish up old matters or to expedite handling of one related matter; that Seymore's supervisors expressed to Seymore their concern that he was devoting too much time to his former projects and too little to his work in Book Production; but that Seymore remained overly engrossed with Advertising Production matters, to the detriment of his work in Book Production; and (8) that with respect to Seymore's termination, when Seymore first applied for transfer to other departments of Reader's Digest, no suitable position was available, while Seymore's actions in issuing his memorandum critical of Dutton, the Production Department Director, were sufficient justification for denying further transfer opportunities to Seymore and for Seymore's termination. Defendant's affidavits further state that Dutton's use of the term "black magic" was neither directed at plaintiff nor racially motivated, having occurred only in a memorandum to the personnel office describing the intricacies of the printing process; while Caldwell used the term "splitting a niggerhead" in the context of explaining

to Seymore the meaning of the term—which had at one time been commonly used in the printing industry to describe the accurate hitting of a guide mark. With respect to plaintiff's *quantum meruit* claim, defendant argues that plaintiff has failed to show support for his allegations that the parties agreed by implication that Seymore should receive bonuses for his ideas or that his ideas merited compensation in addition to his salary. With respect to plaintiff's implied or quasi-contract claim, defendant contends that plaintiff has failed to show support for his allegation that defendant was unjustly enriched, since two of Seymore's suggestions were not adopted, the third was not original with Seymore but was suggested to Seymore by Dutton, the fourth was neither original with plaintiff nor specific enough to describe the detailed ongoing changes actually implemented, and the fifth concerned a practice actually implemented at Reader's Digest on three separate occasions prior to the time Seymore made the suggestion.

*Discussion*

■ In general, in order to prevail on a summary judgment motion, the party making the motion must show (1) that there is no genuine issue of material fact to be tried in the case and (2) that the moving party is entitled to a judgment as a matter of law. F.R.Civ.P. 56(c); see *Adickes v. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (burden on moving party to show absence of any genuine issues of material fact); *SEC v. Research Automation*, 585 F.2d 31 (2d Cir. 1978) (moving party must show both that no triable issues of fact exist and that it is entitled to judgment as a matter of law; while not necessarily precluded, summary judgment likely to be inappropriate when the issues involve intent, or are otherwise "complex and convoluted"); *Egelston v. State Univ. College at Genesco*, 535 F.2d 752 (2d Cir. 1976) (finding summary judgment inappropriate in Title VII case, while noting "our concern for efficiency must never be permitted to outweigh our concern for individual rights"); *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317 (2d Cir. 1975) (court must resolve all ambiguities and draw all reasonable inferences in favor of party against whom summary judgment is sought; in contract case, summary judgment improper where contract language susceptible of two constructions). Under Rule 56(e), a party opposing a summary judgment motion supported by affidavit or by material obtained during discovery may not rest on the allegations in his pleadings, but must respond by affidavit or other permissible discovery material setting forth specific facts showing that there is a genuine issue for trial. Rule 56(e), F.R.Civ.P.; see *SEC v. Research Automation, supra*, 585 F.2d at 33 (not sufficient for party opposing summary judgment motion supported by affidavits or other documents to assert a conclusion without "supplying supporting arguments or facts"); *Beal v. Lindsay*, 468 F.2d 287, 291 (2d Cir. 1972) (when movant comes forward with facts showing opponent's claim baseless, other party must adduce factual material (1) raising substantial question of veracity or completeness of movant's showing; or (2) presenting countervailing facts); *Dressler v. M/V Sandpiper*, 331 F.2d 130, 133 (2d Cir. 1964) (under analogous admiralty rules, party opposing motion must come forward with "concrete particulars").

■ When summary judgment has been considered in Title VII/§ 1981 cases, it has been applied sparingly because, once a plaintiff has shown by factual support or permissible inference that a *prima facie* case of discrimination exists, the subordinate issues of defendant's legitimate business reasons for discriminatory treatment or business need for a test or practice with discriminatory impact, and plaintiff's further showing that such business need or reasons are mere pretext for discrimination, turn so significantly on the veracity of witnesses that in effect they can only be assessed properly after an evidentiary hearing. See *Robinson v. 12 Lofts Realty*, 610 F.2d 1032 (2d Cir.) (finding that, upon inferences drawable from change in cooperative apartment house policy, plaintiff had made *prima facie* case of housing discrimination; reversing order denying application for pre-

liminary injunction and remanding to district for hearing to produce coop board witnesses and consider their veracity; and cautioning that race need not be sole motivating factor in denial with discriminatory effect for plaintiff to prevail, that subjective reasons advanced by defendant should be analyzed carefully for evidence of subtle discrimination, and that dismissal of claim would be proper only if "racial motivation did not play any role" in decision to deny plaintiff housing, *id.* at 460–63.) On the other hand, a plaintiff must show by more than a conclusory allegation that a *prima facie* case exists, and inferences of discrimination will not be drawn merely from the fact that plaintiff is Black. In *Gatling v. Atlantic Richfield*, 577 F.2d 185 (2d Cir.), *cert. denied*, 439 U.S. 861, 99 S.Ct. 181 (1978), for instance, the Second Circuit found that where plaintiffs fail to deny the facts sworn in defendant's affidavits or submitted in defendant's statement under Rule 9(g) of the local rules of the Southern District of New York, and support their allegations that their contract with defendant was terminated for racial reasons by one plaintiff's opinion (stated in affidavit) that " 'it was apparent . . . in this personal confrontation with the agents that they were unhappy over the race and color of the plaintiffs,' " without further factual support, and where plaintiffs had ample opportunity through discovery to develop the facts, the granting of summary judgment in a § 1981 discrimination case was proper.[4]

A. Application

Under this standard, it is clear that summary judgment is inappropriate as to the majority of plaintiff's discrimination claims. Plaintiff's affidavits and other supporting materials show that a genuine dispute exists as to many of the facts necessary to establish plaintiff's *prima facie* case of discrimination in seven of the eight areas plaintiff cites, including (1) whether plaintiff's particular job skills or qualifications were comparable to those of the white individual who received a higher starting salary; (2) the nature of plaintiff's access to office supplies and working conditions when compared to those of white co-workers in advertising production; (3) the nature of plaintiff's treatment when plaintiff raised suggestions at Production Department meetings when compared to treatment of whites who raised suggestions at such meetings; (4) whether a bonus was given to Bert N. Caldwell for a specific suggestion under the Reader's Digest bonus plan; (5) whether the timing of the merit review given to plaintiff following his transfer to Book Production was comparable to that given to a white employee after a similar transfer; (6) whether or not, after plaintiff's transfer to Book Production, he was being assigned more work than any white employee in Book Production; and (7) the availability of positions in other departments of Reader's Digest after plaintiff requested a transfer and, as to the insubordination issue raised in defendant's justification, the nature of the instruction from Kent Rhodes to plaintiff regarding the issuance of further memoranda. Furthermore, it is clear that the inferences which may be drawn from certain of the statements in plaintiff's affidavit—most importantly, his version of the "splitting a niggerhead" conversation with Caldwell—support a "pretext" rebuttal of any of the legitimate business reasons or assertions of business necessity advanced by defendant for plaintiff's treatment in Advertising Production, and that, as in *Long v. Ford Motor Co.*, 496 F.2d 500, 506 (6th Cir.

---

4. For a discussion of burden of proof in Title VII cases, see *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1976) ("disparate treatment" case); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) ("disparate effects" case); *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 1849, 28 L.Ed.2d 158 (1971) ("disparate effects"). For individual employment discrimination cases under 42 U.S.C. § 1981, the scope of liability has been held to be congruent with that under Title VII, see *Scott v. University of Delaware*, 601 F.2d 76, 80 n.2 (3d Cir.), *cert. denied*, 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1975); *Long v. Ford Motor Co.*, 496 F.2d 500, 505 n.11 (6th Cir. 1974); *Williams v. Interstate*, 458 F.Supp. 20 (S.D.N.Y.1978).

1974), it may further be inferred that the course of events in Advertising Production led or at least contributed to plaintiff's subsequent treatment in Book Production and to plaintiff's eventual discharge. As to plaintiff's third claim of discrimination in training, however, plaintiff has failed to specify any comparable white employee who received better training and thus has failed to support a *prima facie* case under either *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1976) (disparate treatment case), or *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (disparate effects case).[5] For a specific discussion of the elements of a *prima facie* case in a training discrimination case, see *Long, supra*, 496 F.2d at 506 (§ 1981 case applying *McDonnell* criteria: plaintiff must show he was trained inadequately, while white co-employees were trained adequately); *Taylor v. Safeway Stores*, 365 F.Supp. 468, 472 (D.Colo.1973), *aff'd in part and reversed in part on other grounds*, 524 F.2d 263 (10th Cir. 1975) (plaintiff must show his training was different from that given to whites); *cf. Wainwright v. Allen*, 461 F.Supp. 293 (D.N.D.1978) (Title VIII and § 1982 claim: discriminatory treatment must extend to some act; racially abusive language, standing alone, not sufficient for *prima facie* case). Defendant has therefore met its Rule 56 burden with respect to this issue, see *Gatling, supra*, and partial summary judgment will be granted on this claim unless plaintiff submits to the Court, within thirty days, further affidavits or documents in the nature of an offer of proof showing that there is a material issue of fact as to differences in the training given comparable white employees.

## B. Contract Law Claims

As noted above, plaintiff's pleadings allege three possible contract law claims: a claim in *quantum meruit* based on an implied agreement to pay bonuses or suggestion awards; a *quantum meruit* claim for the excess of the value of plaintiff's services to defendant over the amount of salary paid to plaintiff, based on plaintiff's election of remedies following breach of his employment contract; and a quasi-contract claim for unjust enrichment to defendant Reader's Digest based on receipt and/or use of plaintiff's suggestions and ideas.

### 1. Legal standard

 Under New York law, where there is an express employment contract setting terms of compensation, an action will not lie in *quantum meruit*. *Jontow v. Jontow*, 34 A.D.2d 744, 310 N.Y.S.2d 145 (1st Dept. 1970). If one party performs in reliance upon a contract too vague in its terms to be enforceable, however, that party may recover in *quantum meruit*: "'the law will presume a promise to pay the reasonable value of [plaintiff's] services,'" *Towers v. Doroshaw*, 5 Misc.2d 241, 159 N.Y.S.2d 367, 377 (Sup.Ct. Onondaga Co.1957), quoting *Varney v. Ditmars*, 217 N.Y. 223, 111 N.E. 822 (Ct.App.1916), as long as those services resulted in benefit to the defendant, *Towers, supra*, 159 N.Y.S.2d at 379. In addition, where an employment contract has been breached by the employer, the aggrieved employee may elect between suing for his compensation under the terms of the contract or suing in *quantum meruit* for the reasonable value of the work performed, minus the value of any payments received, *Wegman v. Dairylea Cooperative*, 50 A.D.2d 108, 376 N.Y.S.2d 728 (4th Dept. 1975), *appeal dismissed*, 38 N.Y.2d 918, 382 N.Y.S.2d 979, 346 N.E.2d 817 (Ct.App.1976); *S. T. Grand v. Cedar Bay Park*, 14 Misc.2d 428, 182 N.Y.S.2d 747 (Sup.Ct.N.Y.Co.1958); C. McCormick, Law of Damages § 158 (1935 ed.). In this context, it should be noted that wrongful discharge, a material change

---

**5.** Even if it is assumed that plaintiff could make out a *prima facie* case of individual discrimination under *Griggs* by statistical comparisons alone, see *Robinson v. 12 Lofts Realty*, 610 F.2d 1032 (2d Cir. 1979); *Davis v. Califano*, 613 F.2d 957 (1980), or by statistical comparisons bolstered by evidence of racial prejudice, as in the "splitting a niggerhead" conversation, see *Robinson, supra* at 1040 plaintiff has failed to make any relevant statistical *comparison* on this issue to show disproportionate impact.

in an employee's duties and conditions of employment from what was promised, or a significant reduction in an employee's rank may all constitute breach of an employment contract and, as a corollary, acts done in defense of an employee's contract rights "or in assertion of an agreed status or function" are not insubordination and do not justify termination of employment. *Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 330 N.Y.S.2d 33, 280 N.E.2d 867 (Ct.App.1972). A quasi-contractual obligation, by contrast, is one imposed where there has been no agreement by the parties but where one party has been unjustly enriched and in equity and good conscience should compensate another. *Miller v. Schloss*, 218 N.Y. 400, 113 N.E. 337 (Ct.App. 1916). The concept has been extended to cover services received where a defendant has not contracted to receive such services but receives benefit therefrom, *Bradkin v. Leverton*, 26 N.Y.2d 192, 309 N.Y.S.2d 192, 257 N.E.2d 643 (Ct.App.1970) and "it would be against good conscience for the defendant to retain the benefits . . . without compensating the plaintiff for the services he fully performed," *id.* (Plaintiff had been employed by corporation to procure, on commission, clients in need of financing; plaintiff procured such a client; defendant, an officer of the corporation, arranged private financings with client plaintiff had procured for corporation without paying commission to plaintiff and was held liable for commission at same rate corporation would have paid). In this context, a plaintiff alleging that a defendant has been unjustly enriched by retention of plaintiff's idea or suggestion must show that the idea or suggestion was "novel, unique and original" and that it was in fact used by defendant, see, *e. g.*, *Educational Sales Programs, Inc. v. Dreyfus Corp.*, 65 Misc.2d 412, 317 N.Y.S.2d 840, 843 (Sup.Ct.N.Y.Co.1970). If the idea or suggestion is already the subject of general knowledge, or has as its basis an improvement of a standard technique, or better use of existing means, or the "mix-

ture of known ingredients in somewhat different proportion" or is so indeterminate in detail that its content could not be fixed at the time plaintiff claimed to have originated it, the idea has no value as property and cannot be a basis for a finding that defendant was unjustly enriched. *Id.* at 844–45.

### 2. Application

█ Since plaintiff has not offered or attempted to offer any proof that his alleged entitlement to bonuses or suggestion awards was the result of an agreement separate from his employment agreement with Reader's Digest, his *quantum meruit* claim must rest on the second possible theory of *quantum meruit* recovery, *i. e.*, that plaintiff's employment contract was breached, and that plaintiff was accordingly entitled to recover in *quantum meruit* for the value of his services over and above the amount of salary he was paid. It is clear that a disputed issue of material fact exists as to whether plaintiff's employment contract was breached, either by failure to give plaintiff the status and working conditions (*i. e.*, an office with a desk) that plaintiff states he was promised, or by treating plaintiff discriminatorily. It is also clear that a disputed issue of material fact exists as to the benefit plaintiff conferred on defendant with his suggestions and ideas, in comparison to the benefit conferred by such suggestions as Caldwell's suggestion to switch to uncoated paper (which plaintiff asserts entitled Caldwell to a $15,000 bonus).

█ With respect to plaintiff's quasi-contract claim, however, defendant has made a showing sufficient for granting summary judgment, since plaintiff has not provided any support on the issue of whether his suggestions and ideas were novel or unique and thus could form a basis for a finding of unjust enrichment under *Educational Sales, supra.*[6]

---

**6.** Seymore states in his affidavit that "I have never claimed to have invented my ideas and suggestions." Seymore Affidavit at 15. Fur-

thermore, plaintiff provides no factual statements or arguments to rebut defendant's Rule 9(g) statement that plaintiff's suggestions con-

## C. Statute of Limitations

Defendant further contends that plaintiff's claims under 42 U.S.C. § 1981 are time-barred, since defendant asserts that a one-year statute of limitations applies and that the complaint in this case was filed fifteen months after plaintiff was discharged from Reader's Digest.

▋ Under *Johnson v. Railway Express*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), in a § 1981 action, the court must apply "the most appropriate [statute of limitations] provided by state law." *Id.* at 462, 95 S.Ct. at 1712. The Second Circuit has consistently found that the three-year statute of limitations contained in CPLR § 214(2), actions under a statute, is the most appropriate state statute in § 1981 cases, *Keyse v. California Texas Oil Corp.*, 590 F.2d 45, 47 (2d Cir. 1978); *Cates v. Trans World Airlines*, 561 F.2d 1064, 1067 n. 4 (2d Cir. 1977); *Romer v. Leary*, 425 F.2d 186, 187 (2d Cir. 1970); *cf. Leigh v. McGuire*, 613 F.2d 380 (2d Cir. 1979); *see also Paschall v. Mayone*, 454 F.Supp. 1289, 1294 (S.D.N.Y.1978); *Savage v. Kibbee*, 426 F.Supp. 760 (S.D.N.Y.1976). Defendant has suggested that the one-year statute of limitations found in the New York Human Rights Law, N.Y. Executive Law § 297(5), would be a more appropriate limitations period for this action. While a more specifically appropriate state statute of limitations might be applicable in some instances, see *Paschall, supra*, this does not appear to be such an instance.[7] The limitation period suggested by defendant is part of an overall statutory scheme which specifies certain prohibited discriminatory behavior, sets up an administrative grievance mechanism, and further establishes, in § 297(9), a private cause of action for unlawful discriminatory actions. This appears to be more analogous to the statutory scheme established by Title VII, than to the independent and broader-purposed § 1981, which has the goal of ensuring generally that non-whites are treated equivalently to whites under the law, including their ability to contract, to serve as witnesses, and to bring legal actions. See *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). Section 297(5)'s statute of limitations is therefore less appropriate in a § 1981 action than is the more general limitation period of CPLR § 214(2). *Savage, supra* at 763–64 (in comparison of appropriateness of two statutes, court applies CPLR); but see *Theobald v. Botein, Hays, Sklar & Herzberg*, No. 78–850 (Brieant, J.) (slip op., March 6, 1979) (§ 297(5) limitation applied, without discussion of CPLR § 214(2)).

## D. Right to Jury Trial

### 1. Legal Standard

▋ Under the principles of *Curtis v. Loether*, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1973), the provisions of the Seventh Amendment granting a right to jury trial in federal court actions at law " . . . apply to actions enforcing statutory rights, and require[ ] a jury trial on demand, if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." *Id.* at 194, 94 S.Ct. at 1008. Since the remedy provided under Title VII—reinstatement and award of back

---

cerning densitometry and automatic ink feed were not used by defendant or that his suggestions on ink reformulation or adoption of 100-line screen were not adopted as part of ongoing process (and therefore were "malleable in detail," see *Educational Sales, supra* ) or that his suggestion as to same-sized film was not at the very least a modification of an existing practice, see *id.*

**7.** While certain allegations in plaintiff's complaint might trigger other more specific stat-

utes of limitation, such as the six-year contract statute of limitations of CPLR § 213(2) for actions based on services rendered, see *Rappaport v. Blank*, 66 A.D.2d 690, 411 N.Y.S.2d 239 (1st Dept. 1978), or the three-year statute of limitations for personal or property injuries resulting collaterally from breach of contract, CPLR §§ 214(4) and (5), the Court need not rule on the applicability of such sections since the complaint would be timely under any of those sections as well.

pay—is essentially equitable, courts in this circuit and in the majority of circuits have held that a Title VII plaintiff has no right to demand a jury trial, see, *e. g., Travers v. Corning Glass Works*, 76 F.R.D. 431, 436 (S.D.N.Y.1977) (discussing case law), *McCray v. Standard Oil Co. (Indiana)*, 76 F.R.D. 490 (N.D.Ill.1977) and no right to compensatory or punitive damages, see, *e. g., Whitney v. Greater N.Y. Corp. of Seventh-Day Adventists*, 401 F.Supp. 1363, 1368–71 (S.D.N.Y.1975) (discussing cases in various circuits); *Travers v. Corning Glass Works, supra*, 76 F.R.D. at 434 n.11; *Preseissen v. Swarthmore College*, 71 F.R.D. 34, 45–46 n.12 (E.D.Pa.1976) (noting and criticizing cases which have gone the other way).

Section 1981, on the other hand, provides for remedies essentially independent of those provided under Title VII, *Johnson v. Railway Express, supra.* A plaintiff under § 1981 may demand compensatory and punitive damages under the *Curtis* rationale, since § 1981 is more analogous to a claim sounding in tort, an action at law, see *Curtis, supra*, 415 U.S. at 195, 94 S.Ct. at 1008, than to the inherently equitable claims for injunctive relief, reinstatement and back pay created under Title VII, see *Johnson, supra; Allen v. Amalgamated Transit Union*, 554 F.2d 876, 883 (8th Cir. 1977). Under the same rationale, a § 1981 plaintiff demanding compensatory or punitive damages may demand a jury trial, *McCray, supra*, unless the claims for punitive and/or compensatory damages under § 1981 are so baseless as to be treated as a sham, see *Lynch v. Pan American World Airways*, 475 F.2d 765, 766 (5th Cir. 1973) (denying plaintiff's request for jury trial where basic claim under § 1981 for reinstatement and back pay and allegations for compensatory and punitive damages "unsupported"). A plaintiff claiming more than nominal damages under this section must prove actual injury, see *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (§ 1983 action). In an analogous action for a racially motivated refusal to rent, however, the Seventh Circuit has held that "compensatory damages may be awarded for the humiliation suffered by plaintiffs, whether inferred from the circumstances or established by the testimony," *Seaton v. Sky Realty Co.*, 491 F.2d 634, 637–38 (1974). See also *Zarcone v. Perry*, 572 F.2d 52 (2d Cir. 1978) (punitive damage award justified under § 1983 for discriminatory and irrational behavior by state-court judge); *Allen, supra*, 554 F.2d at 884 (continued discriminatory actions by union justified award of punitive damages).

Moreover, the right to sue for compensatory and punitive damages and to demand a jury trial extends to cases in which a plaintiff has joined a § 1981 suit to a claim for equitable relief under Title VII, *McCray, supra.* In such cases, the jury will consider and decide both the legal claim and all issues common to both the legal and the equitable claims. *Curtis, supra*, 415 U.S. at 196 n.11, 94 S.Ct. at 1009, citing *Beacon Theatres v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); *McCray, supra*, 76 F.R.D. at 501.

**2. Application**

Under this standard, defendant's motion to strike plaintiff's demand for a jury trial must be denied. Plaintiff has properly demanded such a trial based on plaintiff's claim for compensatory and punitive damages under § 1981, see *McCray, supra*; plaintiff's claim for compensatory and punitive damages is not "unsupported," as was the claim in *Lynch*, but is rather based upon plaintiff's allegations that he suffered humiliation as a result of defendant's conduct (a proper basis for compensatory damages under *Seaton, supra*) and that defendant engaged in a willful course of discriminatory conduct (a proper basis for punitive damages under *Allen, supra*).

*Conclusion*

Defendant's motion for summary judgment with respect to plaintiff's employment discrimination claims is granted as to plaintiff's claims of discrimination in training, subject to plaintiff's submission of further supporting affidavits or documents within

thirty days. Defendant's motion for summary judgment on plaintiff's first and second claims is denied in all other respects. Defendant's motion for summary judgment on plaintiff's third claim is denied as to the *quantum meruit* claim and granted as to the quasi-contract claims. Defendant's motions to dismiss plaintiff's § 1981 claim as time-barred and to strike plaintiff's claims for compensatory and punitive damages and plaintiff's demand for a jury trial on the § 1981 claim are denied.

SO ORDERED.