James P. WICKSTROM, Donald J. Minniecheske, Plaintiffs, Pro Per,

v.

Steven D. EBERT, Wisconsin Assistant Attorney General, Fred A. Fink, Jr., Wisconsin Assistant Attorney General, J. Douglas Haad, Wisconsin Assistant Attorney General, Wendell Harker, Wisconsin Department of Criminal Investigation, Michael G. Eberlein, Circuit Judge Br. # 1, Shawano County, Wisconsin, Earl W. Schmidt, Circuit Judge Br. # 1, Shawano County, Wisconsin, Garry R. Bruno, District Attorney, Shawano County, Wisconsin, Betty Redman, Register of Deeds, Shawano County, Wisconsin, John Does & Jane Roes (No's 1-50), et al., Defendants.

No. 83-C-2017.

United States District Court, E.D. Wisconsin.

April 5, 1984.

James P. Wickstrom, Tigerton, Wis., pro se.

Donald J. Minniecheske, pro se.

Charles A. Bleck, Asst. Atty. Gen., Madison, Wis., for Harker, Ebert, Fink, Haag, Eberlein, Schmidt, Grover (John Doe No. 1) and LaFollette (John Doe No. 4).

Stuart B. Eiche, deVries, Vlasak & Schallert, Milwaukee, Wis., for Bruno and Redman.

## DECISION AND ORDER

WARREN, District Judge.

Presently before the Court are the several motions to dismiss filed by the ten named defendants in this case. Because the Court concludes, as stated herein, that the doctrines of judicial, prosecutorial, and witness immunity and the limitations on the scope of 42 U.S.C. § 1983 preclude the plaintiffs from maintaining the present action for alleged violations of their constitutional rights, the defendants' motions to dismiss must be granted. In addition, the movants will be awarded their costs incurred in defending this action to date.

## BACKGROUND

As the Court recounted in its *Decision and Order* of February 8, 1984, plaintiffs filed their complaint in this action on December 28, 1983, seeking monetary damages for alleged deprivations of their constitutional rights, in violation of 42 U.S.C. § 1983. 101 F.R.D. 26. Plaintiffs' principal allegations arise out of the state criminal prosecutions against them for violations of Wis.Stat. § 946.69(1), making it unlawful for one not a public officer or employee to assume to act in an official capacity.

On January 16, 1984, defendant State Circuit Court Judges Michael G. Eberlein, Earl W. Schmidt, and Thomas G. Grover

moved for dismissal of the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the basis that the present action against them is barred under the doctrine of judicial immunity. One day later, on January 17, 1984, defendants Gary R. Bruno, Shawano County District Attorney, and Betty Redman, Shawano County Register of Deeds, filed a motion for a more definite statement of plaintiffs' complaint pursuant to Rule 12(e) of the Federal Rules of Civil Procedure or, in the alternative, to dismiss the action pursuant to subsections (1), (4), & (6) of Rule 12(b), on the grounds that the Court lacks jurisdiction over the subject matter, that service of process was insufficient, and that the complaint fails to state a claim upon which relief can be granted.

On January 24, 1984, defendant Assistant Attorneys General Steven D. Ebert, Fred A. Fink, Jr., and J. Douglas Haag likewise moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, in their case on the basis that the action is barred under the doctrine of prosecutorial immunity. On February 2, 1984, defendant Wendell Harker, special agent in the Criminal Investigation Division of the Wisconsin Department of Justice, filed the fourth motion for dismissal in this case, also pursuant to rule 12(b)(6), on the grounds that the suit is barred by both prosecutorial and witness immunity.

Finally, on February 10, 1984, Wisconsin Attorney General Bronson LaFollette moved to dismiss under Rule 12(b)(6) on the basis that liability cannot attach to him for any violation of 42 U.S.C. § 1983 since he was not personally involved in plaintiffs' state criminal prosecutions.[1]

In its order of February 8, 1984, the Court, in the interest of promoting a full and fair exposition of the issues raised by defendants' motions and in their supporting briefs, granted the plaintiffs an enlargement of time up to and including February 24, 1984, in which to file and serve a response. At the start of its hearing on February 21, 1984, the Court again noted that plaintiffs were to file their responsive brief within three days.

Despite the Court's clearly published scheduling order, the plaintiffs have failed to respond in any fashion to defendants' pending motions. Accordingly, the Court today resolves these pending matters on the basis of defendants' supporting briefs and its own understanding of the several immunity doctrines as applied to section 1983 actions.

### Judicial Immunity And The Claims Against Defendants Eberlein, Schmidt, And Grover

As the Court observed in its order of February 14, 1984, dismissing sua sponte plaintiffs' attempt to join it as a party defendant in this action, the doctrine of judicial immunity has long been recognized as a bar to civil suits against judges for actions taken in their judicial capacities. *See, e.g., Reed v. Village of Shorewood,* 704 F.2d 943, 951 (7th Cir.1983) (judges have absolute immunity for damage suits based on their judicial rulings); *Apton v. Wilson,* 506 F.2d 83, 90 (D.C.Cir.1974) (judge is not liable for any injuries resulting from acts within his jurisdiction).

The doctrine arose because it was in the public interest to have judges who were at liberty to exercise their independent judgment about the merits of a case without fear of being mulcted for damages should an unsatisfied litigant be able to convince another tribunal that the judge acted not only mistakenly but with malice and cor-

---

**1.** In addition, on February 15, 1984, defense counsel Stuart B. Eiche, previously served as a party defendant, filed a motion to clarify or dismiss pursuant to Rule 12(e) and 12(b)(6) of the Federal Rules of Civil Procedure. Because the Court, at its hearing of February 21, 1984, dismissed Mr. Eiche as a defendant in this case, his motion is now moot, and the Court accordingly takes no action on it.

Also dismissed as party defendants on February 21, 1984, were defense counsel Charles S. Bleck, Charles Wnukowski and Dennis R. Ullman, both employees of the Wisconsin Department of Revenue, and State Circuit Court Judge William Sachtjen. None of these previously-served defendants had filed any dispositive motions at the time of the Court's dismissal order.

ruption. *Dennis v. Sparks,* 449 U.S. 24, 31, 101 S.Ct. 183, 188, 66 L.Ed.2d 185, *cert. denied, Duval County Ranch Company, Inc. v. Sparks,* 449 U.S. 1021, 101 S.Ct. 588, 66 L.Ed.2d 483 (1980); *Briscoe v. La-hue,* 460 U.S. 325, —– –—, 103 S.Ct. 1108, 1115–1116, 75 L.Ed.2d 96, 107–108 (1983). Perhaps the best articulation of the doctrine is found in the Supreme Court's 1966 opinion in *Pierson v. Ray,* 386 U.S. 547, 553–554, 87 S.Ct. 1213, 1217–1218, 18 L.Ed.2d 288 (1967):

> Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction, as this Court recognized when it adopted the doctrine, in *Bradley v. Fisher,* 13 Wall. 335 [20 L.Ed. 646] (1872). This immunity applies even when the judge is accused of acting maliciously and corruptly, and it "is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences" [citations omitted]. It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation.

■ In its modern form, the doctrine provides that judges are immune from suit for judicial acts within or in excess of their jurisdiction even if those acts have been committed maliciously or corruptly. *Stump v. Sparkman,* 435 U.S. 349, 355–356, 98 S.Ct. 1099, 1104–1105, 55 L.Ed.2d 331 *rehearing denied,* 436 U.S. 951, 98 S.Ct. 2862, 56 L.Ed.2d 795 (1978), *on remand, Sparkman v. McFarlin,* 601 F.2d 261 (7th Cir.1979); *Gregory v. Thompson,* 500 F.2d 59, 62 (9th Cir.1974). The only

exception to the sweeping cloak of immunity is for acts done in the clear absence of all jurisdiction, as opposed to acts merely in excess of jurisdiction. *Harper v. Merckle,* 638 F.2d 848, 858 (5th Cir.), *cert. denied,* 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1981); *Clark v. Taylor,* 627 F.2d 284, 286 (D.C.Cir.1980).

■ Finally, the factors used in determining whether an act by a judge is "judicial" for purposes of conferring the immunity relate to the nature of the act itself—that is, whether it is a function normally performed by a judge—and the expectation of the parties—specifically, whether they dealt with the judge in his judicial capacity. *Stump v. Sparkman,* 435 U.S. 349, 362, 98 S.Ct. 1099, 1107, 55 L.Ed.2d 331, *rehearing denied,* 436 U.S. 951, 98 S.Ct. 2862, 56 L.Ed.2d 795 (1978), *on remand, Sparkman v. McFarlin,* 601 F.2d 261 (7th Cir.1979); *see also Hampton v. City of Chicago, Cook County, Illinois,* 484 F.2d 602, 608 (7th Cir.1973), *cert. denied,* 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974) (availability of immunity depends on character of conduct under attack).

■ Notwithstanding this absolute immunity afforded judges for actions taken in their judicial capacities, the complaint in this case charges State Circuit Court Judges Eberlein, Schmidt, and Grover with various violations of plaintiffs' constitutional rights, all arising out of the state's criminal prosecutions of the plaintiffs for assuming, without legal authority, to act as public officers in violation of Wis.Stat. § 946.69(1). In particular, Paragraph XIII of the complaint alleges that defendants Eberlein and Schmidt "did willfully and knowingly give aid and comfort to those ... [other] Defendants whose acts are subversive to the United States, and as such, are destroying our children, our homes, our churches, our schools, our businesses, our contracts, our money system, and our government...." Plaintiffs' Complaint at 9 (December 28, 1983).

Paragraphs XIV and XV charge defendants Schmidt and Eberlein with conspiring

to deprive plaintiffs of their constitutional rights, although the precise nature of this deprivation is not made clear; Paragraph XVI alleges that defendant Schmidt, as the judge presiding at plaintiffs' criminal trial, conspired to obstruct the administration of justice by sustaining one of the Government's objections; and Paragraph XXI charges that defendants Eberlein and Schmidt abused their judicial discretion in denying plaintiffs' motions to dismiss the criminal proceedings against them. Plaintiffs' Complaint at 10, 11, 15–16, & 21 (December 28, 1983).

Finally, Paragraph XXV alleges that defendant Grover executed a writ of mandamus on the petition of plaintiff Minniecheske, directing defendants Bruno and Redman to file with the Shawano County Register of Deeds those documents that had been previously removed and upon which the plaintiffs' criminal prosecutions were, in part, premised. The paragraph further charges that defendant Grover "did 'withdraw his signature(s)' from duly filed and served Writ(s) of Mandamus ... without notice and/or hearing before the court (an obvious attempt to cover up crimes mentioned in mandamus), ... constitut[ing] a furtherance of the conspiracy against Plaintiff(s) Wickstrom and Minniecheske which directly resulted in the[ir] unlawful imprisonment...." Plaintiffs' Complaint at 28 (December 28, 1983). Plaintiffs claim that this conduct constituted an abuse of discretion, denying them access to the court and furthering a conspiracy to conceal the criminal acts against them.

The short answer to all of these charges is, of course, that the doctrine of judicial immunity, as described above, operates as a complete bar to any civil action against defendants Eberlein, Schmidt, and Grover based on their judicial acts during the course of or in connection with plaintiffs' criminal prosecutions. Defense counsel has made clear in his brief and plaintiffs have apparently not contested the fact that all of the defendants' decisions in matters involving the state case were clearly made within their jurisdiction as circuit court judges. Furthermore, there can be no

doubt that the particular acts complained of—among them, ruling on evidentiary matters at trial and resolving the dispositive motions of the parties—are inherently judicial.

Accordingly, plaintiffs' various allegations of constitutional violations, even assuming the existence of some colorable basis for them, fail to state a claim upon which relief can be granted. The absolute immunity afforded judges in circumstances such as this wholly insulates defendants Eberlein, Schmidt, and Grover from the attack plaintiffs have raised, necessitating that the Court grant the defendants' motion to dismiss.

### Prosecutorial Immunity And The Claims Against Defendants Ebert, Fink, Haag And Bruno

■ Like judicial immunity, the purpose of granting immunity to public servants such as prosecutors who represent the interests of society as a whole is to forestall an atmosphere of intimidation that would conflict with such officials' resolve to perform their functions in a principled fashion. *Ferri v. Ackerman,* 444 U.S. 193, 203–204, 100 S.Ct. 402, 408–409, 62 L.Ed.2d 355 (1979), *on remand,* 411 A.2d 213, 488 Pa. 113 (1980); *see also Imbler v. Pachtman,* 424 U.S. 409, 423, 96 S.Ct. 984, 991, 47 L.Ed.2d 128 (1976) (immunity springs, in part, from concern that harassment by unfounded litigation would cause deflection of prosecutor's energies from public duties). It is sometimes said that a prosecuting attorney acting as a judicial or quasi-judicial officer enjoys the same immunity from liability for damages that protects a judge who acts within his or her jurisdiction over parties and litigation. *Robichaud v. Ronan,* 351 F.2d 533, 536 (9th Cir.1965); *Kostal v. Stoner,* 292 F.2d 492, 493 (10th Cir. 1961), *cert. denied,* 369 U.S. 868, 82 S.Ct. 1032, 8 L.Ed.2d 87, *rehearing denied,* 370 U.S. 920, 82 S.Ct. 1559, 8 L.Ed.2d 500 (1962).

■ At the same time, absolute prosecutorial immunity is confined to "quasi-judicial" actions—that is, where the prosecut-

ing attorney acts as an "advocate." *McSurely v. McClellan,* 697 F.2d 309, 319 (D.C.Cir.1982); *Hampton v. Hanrahan,* 600 F.2d 600, 631–632 (7th Cir.1979). In other words, the immunity attaches only to prosecutorial acts constituting an integral part of the judicial process such as initiating a prosecution and presenting the state's case. *Butz v. Economou,* 438 U.S. 478, 510–511, 98 S.Ct. 2894, 2912–2913, 57 L.Ed.2d 895 (1978); *White v. Bloom,* 621 F.2d 276, 280 (8th Cir.), *cert. denied,* 449 U.S. 995, 101 S.Ct. 533, 66 L.Ed.2d 292 (1980) and 449 U.S. 1089, 101 S.Ct. 882, 66 L.Ed.2d 816 (1981), *appeal after remand,* 649 F.2d 560 (8th Cir.1981).

A prosecutor engaged in essentially investigative or administrative functions receives only the lesser protection of qualified immunity. *Dellums v. Powell,* 660 F.2d 802, 805 (D.C.Cir.1981); *Daniels v. Kieser,* 586 F.2d 64, 67 n. 5 (7th Cir. 1978), *cert. denied,* 441 U.S. 931, 99 S.Ct. 2050, 60 L.Ed.2d 659 (1979). In determining whether a prosecutor enjoys absolute or qualified immunity from civil liability, federal courts must apply a functional analysis to determine whether prosecutorial acts fall within the bounds of "judicial" as opposed to "investigative" or "administrative" duties. *Ross v. Meagan,* 638 F.2d 646, 648 (3d Cir.1981); *see also Briggs v. Goodwin,* 569 F.2d 10, 19–21 (D.C.Cir. 1977), *cert. denied,* 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978), *cert. granted, Stafford v. Briggs,* 439 U.S. 1113, 99 S.Ct. 1015, 59 L.Ed.2d 71 (1979), *appeal after remand,* 698 F.2d 486 (D.C.Cir.1983) (crucial inquiry "concerns the nature of the official behavior challenged, not the identity or title of the officer responsible therefor").

The allegations in the present case against defendants Ebert, Fink, Haag, and Bruno fall squarely within the ambit of the absolute protection afforded prosecutors under the immunity doctrine. As plaintiffs' complaint indicates, defendants Ebert, Fink, and Haag were, at all times relevant to the charges against them, employed in the Wisconsin Department of Jus-

tice as Assistant Attorneys General, while defendant Bruno served as District Attorney for Shawano County.

The specific charges against these defendants are as follows: Paragraph XIII of the complaint alleges that defendant Ebert gave aid and comfort to those other defendants who are intent on destroying the nation's children, churches, schools, businesses, and the like. In Paragraphs XIV and XV, defendants Fink and Haag, respectively, are charged with depriving plaintiffs of the rights and privileges secured to them under the United States Constitution; Paragraph XV also alleges that defendant Bruno conspired with defendant Redman to "unlawfully remove a Land Title Document (Constitution Township of Tigerton Dells Charter & Common Law Contract) ... duly filed ... [with the] Register of Deeds for Shawano County," thus violating his own oath of office and infringing plaintiffs' constitutional right to freedom from unreasonable searches and seizures. Plaintiffs' Complaint at 8–9, 10, & 11–15 (December 28, 1983).

According to Paragraph XVI, defendant Fink conspired with defendant Schmidt to obstruct justice by objecting to a line of questioning during plaintiffs' state criminal trial, thus concealing defendant Bruno's "perjured Statements, falsely alleging his unfounded/frivolous 'authority' to remove and/or destroy a duly recorded lawful instrument...." Plaintiffs' Complaint at 15–16 (December 28, 1983). In Paragraph XXI, plaintiffs inferentially allege, among other things, that some or all of these defendants engaged in a conspiracy with defendants Eberlein and Schmidt through which plaintiffs' motions to dismiss the state criminal prosecutions against them were unlawfully denied. Moreover, it is plaintiffs' contention that the Assistant Attorneys General prosecuting that case had no legal authority to do so under state law and that their unauthorized appearance in the criminal proceeding exposed them to civil penalties for acting outside the limits of their statutory duties.

Paragraph XXII charges defendants Ebert, Bruno, and Harker with conspiracy to commit perjury by signing the original criminal complaint against plaintiffs and likewise alleges that defendants Haag and Harker conspired to commit perjury in signing the amended complaint. Finally, plaintiffs claim that defendant Bruno "commit[ted] a second criminal act of perjury" in refusing to permit plaintiffs to file their land title document and contract with the Shawano County Register of Deeds. Plaintiffs' Complaint at 29 (December 28, 1983).

In support of their motion to dismiss, defendants Ebert and Haag have filed affidavits establishing that, at all relevant times, they and defendant Fink were acting as duly appointed special prosecutors, responsible for consulting with and advising defendant Bruno in, among other proceedings, the criminal prosecutions of the plaintiffs. Affidavit of Steven D. Ebert at 2–3 (January 24, 1984); Affidavit of J. Douglas Haag at 2–3 (January 24, 1984). On the basis of these unopposed affidavits and the copies of various petitions and court orders appended thereto, the Court concludes that defendants Ebert, Fink, and Haag were fully authorized to appear, along with defendant Bruno, as counsel for the state in all matters related to plaintiffs' criminal trial.

Beyond this threshold matter, there can be no doubt that all of the acts undertaken by these defendants in the performance of their prosecutorial duties were quasi-judicial and that none was performed outside the defendants' roles as advocates. For example, defendant Fink's objection to a proposed line of questioning at trial and his apparent opposition—and that of his co-defendants—to plaintiffs' motion to dismiss are inherent in the role of the advocate-prosecutor. Likewise, the defendants' involvement in the preparation of the original and amended criminal complaints, regardless of the precise nature and scope of that involvement, surely constituted an integral part of the judicial process in that case.[2]

Only slightly less obvious is the protection afforded defendant Bruno for his apparent refusal to permit plaintiffs to file their land title document and contract with the Shawano County Register of Deeds. Although it is not entirely clear from either plaintiffs' complaint or this defendant's motion to dismiss whether this filing matter was integral to the state's criminal prosecutions, the Court opines that it was sufficiently related to justify conferring upon defendant Bruno the immunity recognized for lawyer-advocates. In any case, plaintiffs would be hard-pressed to argue under the present facts of this case that defendant Bruno's action supports a valid claim for relief under section 1983, particularly in light of the Attorney General's advice to him that documents of the sort plaintiffs sought to file were nullities, importing no legal force and effect. *See infra* at 936; Exhibit F to Plaintiffs' Supplemental Complaint (February 21, 1984).

Finally, the Court must conclude, based on their sweeping, yet indefinite nature, that the several charges of conspiracy to violate plaintiffs' constitutional rights spring from actions taken by defendants Ebert, Fink, Haag, and Bruno in their capacities as prosecutors. Like plaintiffs' other allegations, these, too, fall subject to the absolute immunity conferred on advocates in quasi-judicial roles and thus fail to state a claim upon which relief can be granted. Accordingly, the defendants' motion to dismiss all charges against them will be granted.[3]

---

**2.** In truth, there is nothing in the record to indicate that the defendants' involvement in the preparation of the complaints went beyond their administering oaths to the complainant, defendant Harker, pursuant to Wis.Stat. § 968.-01. Even assuming, however, that defendants Ebert, Fink, Haag, and Bruno played some larger role in initiating that prosecution, their actions would be wholly insulated from subsequent civil attack under the prosecutorial immunity doctrine.

**3.** Because, with today's order, the Court grants defendant Bruno's motion to dismiss, along with the companion motion of defendant Redman, *see infra* at 935, it need not reach the defendants' alternative request for a more definite statement of the claims against them, pur-

### Witness Immunity And The Claims Against Defendant Harker

Closely allied with the protection afforded judges and prosecutors for actions taken in their official capacities is the doctrine of witness immunity. Writing for the Court in *Butz v. Economou*, 438 U.S. 478, 512, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978), Justice White explained the concept in the context of the other judicial and quasi-judicial protections:

> The cluster of immunities protecting the various participants in judge-supervised trials stems from the characteristics of the judicial process rather than its location .... [C]ontroversies sufficiently intense to erupt in litigation are not easily capped by a judicial decree. The loser in one forum will frequently seek another, charging the participants in the first with unconstitutional animus. See *Pierson v. Ray*, 386 U.S., at 554 [87 S.Ct., at 1218]. Absolute immunity is thus necessary to assure that judges, advocates, and *witnesses* can perform their respective functions without harassment or intimidation.
>
> At the same time, the safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct. The insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious action by judges. Advocates are restrained not only by their professional obligations, but by the knowledge that their assertions will be contested by their adversaries in open court. Jurors are carefully screened to remove all possibility of bias. *Witnesses are, of course, subject to the rigors of cross-examination and the penalty of perjury. Because these features of the judicial process tend to enhance the reliability of information and the impartiality of the decisionmaking process, there is a*

less pressing need for individual suits to correct constitutional error (emphasis supplied).

In *Briscoe v. Lahue*, 460 U.S. 325, 332–34, 103 S.Ct. 1108, 1114–15, 75 L.Ed.2d 96, 106–107 (1983), its most recent statement on the immunities doctrine, the Court described the historical development of the protection afforded witnesses this way:

> In the words of one 19th century court, in damages suits against witnesses, "the claims of the individual must yield to the dictates of public policy, which requires that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible." *Calkins v. Sumner*, 13 Wis. 193, 197 (1860). A witness's apprehension of subsequent damages liability might induce two forms of self-censorship. First, witnesses might be reluctant to come forward to testify [citation omitted]. And once a witness is on the stand, his testimony might be distorted by the fear of subsequent liability [citation omitted]. A witness who knows that he might be forced to defend a subsequent lawsuit, and perhaps to pay damages, might be inclined to shade his testimony in favor of the potential plaintiff, to magnify uncertainties, and thus to deprive the finder of fact of candid, objective, and undistorted evidence. *See* Veeder, *Absolute Immunity in Defamation: Judicial Proceedings*, 9 Colum.L.Rev. 463, 470 (1909). But the truth-finding process is better served if the witness's testimony is submitted to "the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies." *Imbler v. Pachtman*, 424 U.S. 409, 440, 96 S.Ct. 984, 999, 47 L.Ed.2d 128 (1976) (WHITE, J., concurring in the judgment).

At least with respect to private witnesses, it is clear that § 1983 did not abrogate the absolute immunity existing at common law.... Like the immunity for legislators, ... the common law's

suant to Rule 12(e) of the Federal Rules of Civil Procedure.

protection for witnesses is "a tradition ... well grounded in history and reason ...." [*Tenney v. Brandhove* ], 341 U.S. [367] at 376, 71 S.Ct. [783] at 788 [95 L.Ed. 1019 (1951) ].

In the end, the Court found that the principles set forth in *Pierson v. Ray*, 386 U.S. 547, 553–554, 87 S.Ct. 1213, 1217–1218, 18 L.Ed.2d 288 (1967), to protect judges, and in *Imbler v. Pachtman*, 424 U.S. 409, 423–424, 96 S.Ct. 984, 991–992, 47 L.Ed.2d 128 (1976), to protect prosecutors, apply with equal force to witnesses, who "perform a somewhat different function in the trial process but whose participation in bringing ... litigation to a ... conclusion is equally indispensable." *Briscoe v. Lahue*, 460 U.S. 325, 1036, 103 S.Ct. 1108, 1121, 75 L.Ed.2d 96, 114 (1983).

Even before the Supreme Court's most recent articulation of the doctrine, a rule of absolute witness immunity had been recognized by a majority of the Courts of Appeal. In *Charles v. Wade*, 665 F.2d 661, 666–667 (5th Cir.1982), *cert. denied*, 460 U.S. ——, 103 S.Ct. 1426, 75 L.Ed.2d 787 (1983), for example, the Fifth Circuit Court of Appeals described the doctrine this way:

> The witness' immunity—like the immunity accorded to judges and prosecutors—was based upon his status as an essential participant in the judicial process:
>
> > The function of witnesses is fundamental to the administration of justice. The court's judgment is based on their testimony and they are given every encouragement to make a full disclosure of all pertinent information within their knowledge.
>
> [1 F. Harper & F. James, The Law of Torts, [5.22 at 424 (1956).] ....

The common law perceived that the policy of encouraging a witness' free and uninhibited cooperation in the fact-finding process would best be served by insulating the witness from the threat of civil liability for his testimony. Without such immunity, the witness might gauge each of his statements in terms of the possibility of his own personal liability and,

therefore, lack the candor and freedom of expression considered essential to the proper functioning of the judicial process [citation omitted]. The resulting lack of any civil remedy against the dishonest witness "is simply part of the price that is paid for witnesses who are free from intimidation by the possibility of civil liability for what they say." [W. Prosser, the Law of Torts, § 114 at 778 (4th ed. 1971).] ...

> We wish to emphasize that the immunity granted to witnesses—whether under the common law or under § 1983—is not designed to benefit the dishonest witness but to further the broad public interest in having witnesses who are unafraid to testify fully and openly.

Likewise, the Third, Fourth, Seventh, Eighth and Ninth Circuits have uniformly upheld the validity and force of the principle under various circumstances. *See Brawer v. Horowitz*, 535 F.2d 830, 836–837 (3d Cir.1976) (lay witness immunized from subsequent prosecution in *Bivens* type suit); *Burke v. Miller*, 580 F.2d 108, 109–110 (4th Cir.1978), *cert. denied*, 440 U.S. 930, 99 S.Ct. 1268, 59 L.Ed.2d 487 (1979) (witness immunity protects state medical examiner from § 1983 liability); *Kincaid v. Eberle*, 712 F.2d 1023, 1023–1024 (7th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 551, 78 L.Ed.2d 725 (1983) (grand jury witness shielded by absolute immunity in § 1983 action); *Myers v. Bull*, 599 F.2d 863, 866 (8th Cir.), *cert. denied*, 444 U.S. 901, 100 S.Ct. 213, 62 L.Ed.2d 138 (1979) (police officer's testimony at pretrial deposition immuned from attack in subsequent § 1983 suit); *Blevins v. Ford*, 572 F.2d 1336, 1338 (9th Cir.1978) (witnesses "have long enjoyed absolute immunity from civil suits based upon their words, whether perjurious or not").

The doctrine of witness immunity finds classic application under the circumstances of the present case. As noted in defendant Harker's brief in support of his motion to dismiss, the only allegation in plaintiffs' complaint that specifically refers to him is found in Paragraph XXII. There-

in, plaintiffs charge that on October 15, 1982, "Wendell Harker, Special Agent for the Division of Criminal Investigation in the State of Wisconsin Department of Justice ... [along with defendants Bruno and Ebert] conspired to commit perjury upon signing ... [a] Criminal Complaint [against plaintiffs Wickstrom and Minniecheske]." Plaintiffs' Complaint at 25 (December 28, 1983). The paragraph also charges that defendant Harker conspired with defendant Haag in signing an amended complaint against the two plaintiffs on June 1, 1983. Both the original and amended criminal complaints in the state case are appended to plaintiffs' complaint in this action as Exhibits M and N, respectively.

It is abundantly clear to the Court that defendant Harker, in swearing to the criminal complaints charging plaintiffs with various violations of Wis.Stat. § 946.69(1), was assisting in the initiation of a state prosecution as a complaining witness. Although the specific allegations against this defendant are not based on testimony he may have given during the course of plaintiffs' trial itself, the Court nonetheless concludes that the immunity guaranteed witnesses, as described above, applies during any stage in the judicial process at which an individual might be called upon to testify, including the initiation of a criminal prosecution.

In thus performing a task fundamental to the administration of justice, defendant Harker was fully protected from subsequent civil litigation such as this under the doctrine of witness immunity.[4] Having found that he was engaged as an integral player in the state criminal prosecution of the plaintiffs, the Court concludes that the complaint as to defendant Harker fails to state a claim upon which relief can be granted and will, accordingly, grant his motion to dismiss.

**4.** Defendant Harker has also argued in his brief that since he played a pivotal role in initiating the state criminal prosecution against plaintiffs, he is also shielded from subsequent civil litigation under the doctrine of prosecutorial immunity. *See supra* at 929–930. While the Court

### Quasi-Judicial Immunity, The Scope Of 42 U.S.C. § 1983, And The Claims Against Defendants Redman and LaFollette

As indicated by the Court's description of the various protections afforded those who play some fundamental role in the judicial process, "immunity analysis rests on functional categories, not on the status of the defendant." *Briscoe v. Lahue,* 460 U.S. 325, 103 S.Ct. 1108, 1119, 75 L.Ed.2d 96, 112 (1983). Thus it is that judicial immunity not only protects judges against suit for acts done within their jurisdiction, but also spreads outward to shield related public servants, including sheriffs, police officers, clerks of court, referees and trustees in bankruptcy, and receivers appointed to conserve assets. *Smallwood v. United States,* 358 F.Supp. 398, 404 (E.D.Mo.), *aff'd without opinion,* 486 F.2d 1407 (8th Cir.1973); *Boydstun v. Perry,* 359 F.Supp. 48, 50 (N.D.Miss.1973).

In this context, it is generally held that court clerks enjoy absolute immunity for acts done in performance of their discretionary or quasi-judicial duties. *Zimmerman v. Spears,* 428 F.Supp. 759, 762 (W.D.Tex.), *aff'd,* 565 F.2d 310 (5th Cir. 1977); *Glucksman v. Birns,* 398 F.Supp. 1343, 1353 (S.D.N.Y.1975). This rule does not, however, extend to conduct relating to a clerk's merely ministerial functions. *Allen v. Dorsey,* 463 F.Supp. 44, 47 (E.D.Pa. 1978); *Marty's Adult World of New Britain, Inc. v. Guida,* 453 F.Supp. 810, 816 (D.Conn.1978). Instead, ministerial conduct enjoys only a qualified immunity that is triggered by a showing that the court clerk acted in good faith, pursuant to the lawful authority vested in him or her by the state. *Gutierrez v. Vergari,* 499 F.Supp. 1040, 1047 n. 5 (S.D.N.Y.1980); *McCray v. Maryland,* 456 F.2d 1, 3–5 (4th Cir.1972).

is inclined to agree with this alternative proposition, it opines that the related doctrine of witness immunity offers the strongest rationale upon which to dismiss the charges as to defendant Harker and accordingly justifies its decision on that basis alone.

While assuming that defendant Redman's responsibilities as Register of Deeds for Shawano County are not typically those of a court clerk, this Court is convinced that for purposes of this suit, she should enjoy the protection afforded one playing some fundamental role in the judicial process. The principal allegations that defendant Redman faces are found in Paragraphs XV, XVII, and XXI of plaintiffs' complaint; therein, plaintiffs charge that on January 25, 1982, she refused to "file/record ... [plaintiffs'] lawful instrument, one Land Title Document, ... thereby, perjuring her Oath of Office and Jeopardizing her Official Performance Bond of Record." The complaint further states that the defendant was later that day instructed by Shawano County Sheriff James Knope to file the document plaintiffs had prepared. Plaintiffs' Complaint at 17–18 (December 28, 1983).

According to Paragraph XV, defendant Bruno subsequently directed defendant Redman, by letter of March 23, 1982, to expunge from her records any documents relating to the creation of the Constitution Township of Tigerton Dells. Plaintiffs apparently maintain that this action was in furtherance of a conspiracy between defendants Bruno and Redman to unlawfully remove the land title document from the Shawano County Register of Deeds. Plaintiffs' Complaint at 11 & 14 (December 28, 1983).

Putting aside its doubts as to the substantive merits of plaintiffs' section 1983 claim against defendant Redman, the Court is of the view that the doctrine of quasi-judicial immunity protects her from any liability under the statute. The meager factual record in this case indicates that the criminal prosecutions against the plaintiffs were premised, at least in part, on their attempt to encumber certain properties in Shawano County by filing precisely the sort of spurious documents that defendant Redman first refused to accept and later removed from the Shawano County Register of Deeds. This fact, along with the involvement of defendant Bruno in both the plaintiffs' criminal trial and the incidents upon which the charges against defendant Redman are based, leads the Court to conclude that the latter was acting in a quasi-judicial capacity in acting or refusing to act on plaintiffs' land title document. Assuming the existence of such a nexus between her actions and the criminal trial of the plaintiffs themselves, the Court finds that defendant Redman is entitled to the absolute immunity afforded clerks of court and other quasi-judicial officers in the performance of their discretionary duties.

Moreover, even if this defendant's conduct were characterized as wholly ministerial, the Court would be forced to conclude that she acted in good faith, pursuant to the lawful authority vested in her by the state. Absent any malicious intent to cause the alleged deprivation of plaintiffs' constitutional rights and without knowledge that the actions she took might violate those rights, defendant Redman is at least entitled to a defense of qualified immunity. Whatever the nature of the analysis giving rise to the protection, it is clear that plaintiffs cannot maintain this suit against defendant Redman for alleged violations of 42 U.S.C. § 1983.

The same is true of plaintiffs' section 1983 case against defendant LaFollette, although for different reasons. Pursuant to the statute, a person "subjects" another to a deprivation of some constitutional right if the individual performs some affirmative act, participates in another's affirmative act, or omits to perform some act which he or she is legally required to do that causes the deprivation upon which the complaint is based. *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978); *Sims v. Adams*, 537 F.2d 829, 831 (5th Cir.1976).

At the same time, it is well established that liability in actions under section 1983 may not be imposed on the basis of respondeat superior. *DeTore v. Jersey City Public Employees Union*, 615 F.2d 980, 983 (3d Cir.1980), *on remand*, 511 F.Supp. 171 (D.N.J.1981); *Cotton v. Hutto*, 577 F.2d 453, 455 (8th Cir.1978). Rather, personal participation is an essential ele-

ment of every action under the statute, and a state officer is not subject to its strictures unless the deprivation of a constitutional right takes place at his or her direction or with his or her knowledge. *Vinson v. Richmond Police Department*, 567 F.2d 263, 265 n. 4 (4th Cir.1977), *vacated on other grounds*, 438 U.S. 903, 98 S.Ct. 3120, 57 L.Ed.2d 1145 (1978); *Perry v. Elrod*, 436 F.Supp. 299, 302 (N.D.Ill.1977).

■ In short, an individual who had no personal role in the alleged wrongdoing by definition lacks the bad faith required to expose him to damages liability under section 1983. *Kostka v. Hogg*, 560 F.2d 37, 40 (1st Cir.1977); *see also Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214, *rehearing denied*, 421 U.S. 921, 95 S.Ct. 1589, 43 L.Ed.2d 790 (1975) (compensatory damages under § 1983 appropriate only if defendant acted with such impermissible motivation or disregard for established rights that action "cannot reasonably be characterized as being in good faith").

Although plaintiffs maintain that defendant LaFollette is liable for damages under section 1983, nowhere in their original complaint have they alleged that this defendant was personally involved in the state criminal prosecutions upon which this action is premised; nor, for that matter, have they charged that the various deprivations of their constitutional rights were at his direction or with his knowledge. In fact, it is only in their supplemental complaint, filed on February 21, 1984, that plaintiffs identify this defendant by name, charging him with "originat[ing] the unlawful action(s) against the Plaintiff(s) ... to remove a Lawful Filed Common Land Title document (Treaty with the United States Government) of which; was entered into the care of the Shawano County Register of Deeds Office...." Plaintiffs' Supplemental Complaint at 36–37 (February 21, 1984).[5]

This allegation is apparently based on a letter written by defendant LaFollette on March 27, 1982, to the Shawano County District Attorney, advising that "the Constitution Township of Tigerton Dells ... is a legal nullity, as are the appendages it attempts to create, such as the municipal court for Tigerton Dells" and that "the Register of Deeds ... [should] expunge from her record those documents previously filed which relate to the creation of this township." Exhibit F to Plaintiffs' Supplemental Complaint at 37 (February 21, 1984). Plaintiffs maintain that this communication, a precursor of the criminal prosecutions against them, constitutes an act of treason against the United States and its citizens, entitling them to relief pursuant to section 1983.

■ As the Court has already suggested, no section 1983 liability can attach to defendant LaFollette absent some showing—not present here—that he directed the alleged deprivation of plaintiffs' constitutional rights or allowed it to continue with his knowledge. Since the defendant was not himself involved in the plaintiffs' state prosecutions but instead delegated that responsibility to his assistants, the inapplicability of the doctrine of respondeat superior precludes imputation of any wrongdoing to him, even assuming that any such wrongdoing took place.

■ Moreover, to the extent that the claim against defendant LaFollette alleges a violation of section 1983 based solely on his providing the Shawano County District Attorney with advice on the legality of the purported township, it is wholly frivolous and cannot form the basis for any viable civil rights action. In this regard, it is axiomatic that the state Attorney General, in the exercise of his constitutionally-prescribed powers, has the right—even the responsibility—to provide other state law enforcement officials with substantive guidance and practical direction on the per-

---

**5.** At its hearing of February 21, 1984, the Court dismissed plaintiffs' supplemental complaint as to all defendants named and charged therein, with the exception of defendant LaFollette, against whom the charges described herein were made. The Court's decision in this regard was memorialized in its *Order* of February 24, 1984.

formance of their duties under the law. *See, e.g.,* Wis.Stat. § 165.25(3) (Department of Justice empowered to "consult and advise with the district attorneys when requested by them in all matters pertaining to the duties of their office").

In the end, defendant LaFollette's advisory letter to the Shawano County District Attorney does not provide a sufficient basis upon which plaintiffs may maintain their section 1983 suit, whether by itself or as evidence of the defendant's purported involvement in the state criminal action against plaintiffs. As to the latter, the inapplicability of the doctrine of respondeat superior in cases such as this operates as a total bar to further prosecution and requires dismissal of the complaint as to this defendant.

### Plaintiffs' Prosecutorial Conduct And The Award Of Litigation Expenses

■ On several occasions during the brief yet turbulent history of this case, the Court has voiced its disapproval of the manner in which plaintiffs have attempted to prosecute their claims. In its *Decision and Order* of February 8, 1984, the Court characterized as "most disturbing" plaintiffs' production and filing of numerous, spurious documents that purported to be the official orders of this or some other legally-constituted tribunal. Noting that "those various writs and notices only serve to disrupt the orderly progress of litigation ... and promote no legitimate interest in resolving the various claims of the parties fairly and expeditiously," the Court felt compelled to admonish plaintiffs not to file or serve any additional documents of this sort. *Decision and Order* at 11–12 (February 8, 1984).

In the weeks following their initiation of this action, plaintiffs engaged in a deliberate course of vexatious conduct, apparently intended only to harass the named defendants, their attorneys, this Court and its staff. Within a period of less than one month, plaintiffs served their summons and complaint on three Deputy Clerks of Court for the Eastern District of Wisconsin, the two attorneys representing the defendants in this case, two employees of the Wisconsin Department of Revenue, and a state circuit court judge, none of whom were in any way involved with the state criminal prosecutions upon which plaintiffs' complaint is based.

In what was perhaps a calculated attempt to effect the ultimate disruption of the judicial process, plaintiffs, on February 13, 1984, served the Court itself and, on the morning of February 21, 1984, filed an amended complaint incorporating lengthy but wholly frivolous charges against all of the so-called defendants described above.

This patent abuse of process prompted one of the defense attorneys in this case to file a motion to enjoin plaintiffs from serving any additional parties until the Court had resolved the pending dismissal motions. During the hearing on defendants' request for injunctive relief, at which plaintiffs made no appearance, the Court again observed that plaintiffs' actions to date had only served to harass and embarrass the various players in this case. The Court also noted that plaintiffs' process servers were, at times, abusive and threatening to the deputy clerks of court, who were responsible for processing the various documents plaintiffs sought to file. Based on this record of opprobrious conduct, the Court granted defendants' motion, enjoining plaintiffs from serving additional parties until the pending motions for dismissal were resolved.[6]

---

6. Since, by today's order, the Court dismisses this action as to all the named defendants, plaintiffs will not be permitted to serve any additional parties under either the original or supplemental complaints filed in this case.

   Admittedly, plaintiffs had reserved in their original complaint the right to join as additional defendants "John Does & Jane Roes (No's 1–50)" and, in their supplemental complaint, "John

Doe's and Jane Roe's (No's 1 thru 1000)." As the Court noted in its order of February 8, 1984, however, plaintiffs described this class of potential defendants as "[a]ll spouses and kin and/or acquaintences [sic] of the [specifically named] Defendant(s), ... joined ... as a protection to Plaintiffs against any unlawful dissipation of assets and/or attempted conveyance of property attempting to defraud legitimate claims and

Plaintiffs' oppressive approach to the prosecution of their case was most recently exhibited in the three documents filed by their process servers on February 28, 1984. Each entitled, "Notice and Demand/Caveat," these papers allege that the Court acted outside of its jurisdiction when it "became a felon and a trader [sic] to the People of the United States ..." in its administration of this case to date. Most disquieting about these documents, however, is that they threaten the Court with civil prosecution, as follows:

Wherefore demand is upon you Judge Warren to stop and cease this malicious attack on my civil rights in this matter if you do not stop this malicious attack by March 8th, 1984, I will be forced to file an action against you, under Title 42 U.S.C. Section 1893, 1895, 1986 and 1988: with the pains and penalities set forth under Title 18 U.S.C. 241, 242, 2381, 2382, 2383, 2384, 285, 287, 3, 4, 872, 1001, 1341, 1621, 1622, 1623, 1509, 1510, 1503, 1501 ....

This legal Notice and DEMAND/CAVEAT is a warning of irregularities of my civil rights. Take Notice and govern yourself accordingly or action will be taken against you.

Although the Court has wholly disregarded this unseemly threat in deciding the pending motions in this case, it does regard this latest matter as yet another example of prosecutorial arrogance that justifies the sanction it has decided to impose on plaintiffs.

That sanction, to be described forthwith, also springs from the Court's general hostility to lawsuits such as this, filed, as all defendants have noted, merely to persecute and harass public employees in the performance of their delegated duties. All too frequently, the courts of this district—and others throughout the country—are forced to expend their time and resources administering cases in which there is little, if any, basis for relief. Typically, such actions are filed in ignorance of the nature and scope of those remedies available to civil litigants under federal law.

Occasionally, as in this case, ignorance is combined with malice in a suit which, by its very nature, commands the immediate and uninterrupted attention of the Court. The result is that other non-frivolous actions, technically on equal footing with vexatious suits, are not afforded the considered attention they merit, and justice is not done. That individuals like the present plaintiffs are able to so pervert the processes of our judicial system should be a source of great concern among all thinking people, both within and without the legal profession.

While this Court alone cannot remedy what has become a problem for courts across the nation, it can and will exercise its discretion in this case to sanction plaintiffs for the vexatious nature of their suit and the oppressive manner in which they have prosecuted it. In this undertaking, the Court follows a growing trend among the district courts in favor of awarding prevailing defendants the expenses they have incurred in the course of malicious litigation. As District Judge Van Sickle wrote in *Wainwright v. Allen*, 461 F.Supp. 293, 299 (D.N.D.1978),

the traditional American rule allow[s] a prevailing party attorneys' fees when his opponent has litigated "in bad faith, vexatiously, wantonly, or for oppressive reasons." ... *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).... [T]he common law rule depends almost solely on actual bad faith, either in the purpose or the conduct of the litigation.

credits." Plaintiffs' Complaint at 2–3 (December 28, 1983).

Having found that the complaint fails to state a claim as to the specifically named defendants, the Court concludes that plaintiffs' service on their "kin and acquaintances" in the wake of today's decision would serve no useful purpose. Moreover, to the extent that plaintiffs have, in the past, improperly invoked this omnibus category as a means of joining parties with no involvement in their state criminal prosecutions, the Court opines that plaintiffs are now estopped from naming any additional defendants, whether done out of malice and in willful abuse of process or not.

Likewise, most suits awarding attorneys' fees to defendants under the statutes [such as 42 U.S.C. § 1988] have involved malicious litigation, e.g., *Carrion v. Yeshiva University,* 535 F.2d 722 (2d Cir.1976) (the plaintiff's testimony was characterized as an "unmitigated tissue of lies" by the trial judge), or vexatious conduct of a plaintiff in the course of the litigation, e.g., *Robinson v. KMOX–TV CBS Television Station,* 407 F.Supp. 1272 (E.D.Mo.1975).

*See also F.D. Rich Company v. Industrial Lumber Company,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974) (attorneys' fees may be awarded to successful party when opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons); *United States v. Burke,* 548 F.Supp. 724, 730 (D.S.D.1982) (likewise); *In re Willey,* 6 B.R. 235, 236 (Bkrtcy.Colo. 1980); *Delgado v. deJesus,* 440 F.Supp. 979, 982 (D.P.R.1977).

Because the Court concludes that plaintiffs have demonstrated bad faith in both the purpose and conduct of this litigation, it will award all defendants the costs of defending this action, to be assessed against the plaintiffs. In the wake of some nine weeks of harassment, malicious conduct, and opprobrious abuse of process, the Court feels strongly that such a sanction is wholly justified.

### CONCLUSION

For the reasons stated herein, the Court dismisses this action as to all defendants pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and awards defendants their expenses and attorneys' fees, to be assessed against the plaintiffs. Plaintiffs will not be permitted to serve any additional persons as party defendants in this case.